HAZEL CROWDER *v.* STATE COMPENSATION COMMISSIONER *et al.*

(No. 7889)

Submitted April 10, 1934.    Decided May 8, 1934.

*Copenhaver & Boiarsky,* for appellant.

*Homer A. Holt,* Attorney General, and *Kenneth E. Hines,* Assistant Attorney General, for respondent State Compensation Commissioner.

*Koontz, Hurlbutt & Revercomb,* for respondent Pure Oil Co.

MAXWELL, JUDGE:

Claimant, widow of Harry Crowder, deceased, prosecutes this appeal from an order of the state compensation commissioner refusing her an award of compensation on account of the death of her husband.

On the 24th of December, 1931, Crowder was shot to death while in the discharge of his duties as an operator of a gasoline station of the Pure Oil Company in a suburban section of the city of Charleston.

In opposition to the making of an award to the claimant as dependent widow, it is urged that Crowder at the time of his death was not an employee of the Pure Oil Company because the company "did not have the right to supervise his work." He worked under a written agreement with the company. The contract contained many provisions. He was designated therein as special agent of the company. By its terms, he was required to give his exclusive time to the operation of the station, to operate it in compliance with the rules of the company, to pay the company $25.00 per month as consideration for his "designation and appointment as special agent," to keep the station and all products and merchandise in a neat and orderly manner, to render prompt, adequate and courteous service to patrons, to extend credit only to such persons whose credit had been previously approved by the company. As recompense for his efforts, Crowder was to be paid certain specified commissions on sales of the company's products. The company expressly reserved "the right to terminate the agency at any time and for any reason." Numerous other provisions of the contract are not here enumerated. With the consent of the company, Crowder installed in the station a

stock of automobile accessories on his own account. These, of course, were variant from the products of the company which were on sale at the station.

A district manager of the company visited the station at frequent intervals, inspected it closely and gave instructions to Crowder. One of Crowder's employees testified that they considered the visiting manager as their boss. The company's premiums which were paid into the state compensation fund were calculated on the basis of Crowder's being an employee of the company. In a blanket insurance policy carried by the company on the lives of its employees, its station agents were considered employees for the purposes of the insurance contract. The claimant testified that following the death of her husband, the district manager assisted her in making out her claim for compensation on the theory that she would be entitled thereto as the dependent widow of a deceased employee of the company.

"The test of the relation between one having work done and the workman consists in the employer's right or lack of right to supervise the work. If that right exists, the relation is that of master and servant. If that right does not exist, the relation is that of employer and independent contractor." *Greaser* v. *Oil Company*, 109 W. Va. 396, 155 S.E. 170. Cf. *Klipstein* v. *Compensation Commissioner*, 113 W.Va. 567, 169 S.E. 169; *Kirkhart* v. *Gas Company*, 86 W. Va. 79, 102 S.E. 806, 807. From the latter case, we obtain this further assistance: "The relation of the parties is also inferable from other circumstances, such as the method of payment for the work, the furnishing of the tools and equipment for the doing of the work, the right to supervise and direct the method in which the work shall be done, and the extent to which it shall proceed, or when it shall cease." Supplementary to these indicia, consideration should also be given to the question of the person's liability to be discharged for disobedience of rules or orders. Wood on Master and Servant, sec. 317. The same author, in section 314, makes these succinct statements: "The simple test is, who has the general control

over the work? Who has the right to direct what shall be done, and how to do it? And if the person employed reserves this power to himself, his relation to the employer is independent, and he is a contractor; but if it is reserved to the employer or his agents, the relation is that of master and servant. The contract being to do a certain piece of work, the mode of payment does not affect the relation." Applying these criterions to the recited facts, we are of opinion that the relation of employer and employee existed between the Pure Oil Company and the deceased. We are sustained in th's conclusion by the case of *Magnolia Petroleum Company* v. *Pierce*, (Okla.) 269 Pac. 1076, wherein there was involved a contract very similar to the one at bar, and the relation of employer and employee was held to be created thereby.

The Workmen's Compensation statute of this state authorizes the payment of compensation to workmen, whose employers are subscribers to the compensation fund, who have received personal injuries "in the course of and resulting from their employment." Code 1931, 23-4-1. Obviously claimant's decedent was killed in the course of his employment. The remaining query, therefore, is whether his fatal injury resulted from his employment. Both elements must concur. *Burdette* v. *Compensation Commissioner*, 113 W. Va. 348, 167 S. E. 869. That Crowder's injury resulted from his employment is affirmed by the claimant and denied by the employer. The commissioner took the latter view.

There is contradiction of testimony as to whether Crowder was shot by John Harris or his brother, Charles. John lived some distance away. Charles resided with his mother on a lot adjoining the filling station. He had frequently and seriously complained to Crowder and the other station employees because the door to a toilet on the side of the station facing the Harris home was permitted to stand open with much frequency. The station and the Harris home were about fifty feet apart. For some time prior to Crowder's taking charge of the

station, this door was nailed shut, but after he placed in the station his private stock of merchandise permitted by the company, he closed the avenue of approach to the toilet through the station and fixed the outside door so that it could be used. The district manager of the company admitted in testimony that either Crowder or his predecessor had informed him that the Harrises had complained because the toilet door stood open so much of the time.

The homicide occurred between two and three o'clock in the afternoon. Two or three hours earlier, Crowder had ordered John Harris to leave the station. In the afternoon, John returned to the station and, in a hostile manner, went up to Crowder, who, at the moment, was in the act of placing some gasoline in the gasoline tank on the rear of a customer's automobile. Besides the said customer, Crowder's son and another employee and two bystanders were present. Both Crowder and John Harris were armed. There is confusion in the testimony as to what was said and as to which "drew" first. They exchanged several shots and as John walked away, Crowder still firing, a bullet penetrated Crowder's forehead, killing him instantly. Whether this shot was fired by John as he withdrew or by Charles standing on the side porch of his home, the evidence is in direct conflict. John died of his wounds a few hours later.

Evidently the ill-will of the Harrises toward Crowder had been engendered because the door of the toilet at the side of the station was permitted to stand open. This toilet was an adjunct of the station and was primarily for the use of customers of the company. The fact that Crowder had placed merchandise of his own on the inside of the station so that it was necessary to enter the toilet from the exterior entrance is merely incidental. These facts were known to the management of the company. The hostility of the Harrises cannot therefore properly be considered as arising from purely personal differences between them and Crowder. At the root of the whole trouble was the manner of maintenance of the toilet for which the company was primarily responsible.

Crowder was attending to his duties in waiting on a customer when John Harris, armed with a revolver, accosted him; whether with revolver drawn or not the testimony differs. In our opinion, the controlling feature of the occurrence was John's belligerent accosting of Crowder while he was peaceably at work. The exact details of the manner of the occurrences immediately following are of secondary importance.

Where an employee departs from the discharge of his duties and engages in criminal conduct, he is not, while so doing, protected by the workmen's compensation law. *Curran* v. *Const. Co.,* (Pa.) 133 Atl. 261; *Plouffe* v. *Rubber Co.,* 207 N. Y. Supp. 373; *Griffin* v. *Roberson,* 162 N. Y. Supp. 313; *Garrett* v. *Power Co.,* (La.) 141 So. 809; *Merkel* v. *Gillespie Co.,* (N. J.) 162 Atl. 250. But where a man is properly engaged in the discharge of his duties an assault upon him is ordinarily considered as an incident of his employment. *Burdette* v. *Compensation Commissioner,* 113 W. Va. 348, 167 S. E. 869; *In re McNicol,* (Mass.) 102 N. E. 697; *Meucci* v. *Coal Co.,* (Pa.) 123 Atl. 766; *Verschleiser* v. *Stern,* (N. Y.) 128 N. E. 126; *Broadbent's Case,* (Mass.) 134 N. E. 632; *Heitz* v. *Ruppert,* (N. Y.) 112 N. E. 750. Weighing the essential facts of the homicide of Crowder in the light of the principles applied in the cases cited, we are of opinion that Crowder received his fatal injury not only in the course of his employment, but that it resulted from his employment.

For reasons stated, it follows that the order of the compensation commissioner denying compensation to Crowder's widow must be reversed and the case remanded for further proceedings not at variance with the principles herein stated.

*Reversed and remanded.*